IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| FELECIA WARD, | } | |
| | } | |
| Plaintiff, | } | |
| | } | CIVIL ACTION NO. |
| v. | } | 2:12-cv-00257-WMA |
| | } | |
| CITY OF BIRMINGHAM, | } | |
| | } | |
| Defendant. | } | |
| | } | |

**MEMORANDUM OPINION**

Before the court is a motion for summary judgment filed by defendant City of Birmingham ("City") as to all claims brought by plaintiff Felecia Ward ("Ward"). (Doc. 16). Ward asserts two claims under the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601-54 ("FMLA"), one for interference and the other for retaliation. Also pending are Ward's two motions to strike portions of the declarations of Tracy Morant Adams ("Adams Declaration") and Peggy Polk ("Polk Declaration"), (docs. 23 and 24), submitted by the City in support of its Rule 56 motion. For the reasons that follow, Ward's motions to strike will be denied and the City's motion for summary judgment will be granted.

**BACKGROUND**[1]

Ward began working for the City in 1995. Until her termination on October 21, 2010, Ward worked in the Office of

---

[1] Because of the procedural posture, all facts and their reasonable inferences are viewed in the light most favorable to Ward.

Economic Development as an economic development analyst.  Ward's job was to increase the tax base for the City by providing economic development assistance to existing businesses .

According to Ward, her typical work day involved returning telephone calls, attending merchant meetings and other meetings outside of the office, and visiting Birmingham businesses.  The Office of Economic Development sent letters to businesses to initiate contact.  Ward would meet with businesses that contacted the office in response to those letters or on their own initiative.  Ward would also make contact with Birmingham businesses at merchant association and similar meetings.

In February 2008, Tracey Morant Adams ("Adams") became the Director of the Office of Economic Development.  Adams reported directly to the Mayor's Chief of Operations, who under Mayor William Bell was Jarvis Patton ("Patton").  After Adams settled into her position in early 2008, she became concerned about Ward's job performance and whereabouts.  She noticed that Ward would leave the office everyday around 11:00 or 11:30 AM and very rarely return.  When Adams asked Ward what she was doing during that time, Ward said that she was meeting with businesses or at merchant association meetings.  Although Ward could be reimbursed for mileage related to business visits and meetings, she rarely submitted reimbursement requests.  Ward never referred to any of the businesses she visited when she reported to Lisa Cooper

2

("Cooper"), whose job it was to provide companies with financial assistance.

In June 2009, while Ward was on a medical leave unrelated to this case,[2] Adams met with Peggy Polk ("Polk'), the City's Personnel Director, and developed an improvement plan for Ward. The improvement plan gave Ward targeted responsibilities that could be measured.  Adams met with Ward about the plan when she returned to work.

**Continuing Issues with Ward's Job Performance**

In 2009 Ward, in her capacity as economic development analyst, started to work with the Birmingham Construction Industry Authority ("BCIA").  The BCIA provides assistance to minority construction contractors.  Adams met with Michael Bell, the Executive Director of the BCIA, and with Ward and arranged for Ward to work at the BCIA two days a week beginning in September 2009.  On October 1, 2009, Adams received an email from Michael Bell stating that Ward had not shown up for her assignment at the BCIA.  Adams discussed the matter with Ward.  The arrangement with the BCIA continued. Adams let it be known that she expected that if Ward did not go to the BCIA on a given day, she would be at the office.  In addition to her main assignment with the BCIA, Adams expected Ward to continue to provide technical assistance to Birmingham businesses,

_____

[2] Ward took a six week leave of absence in 2009 after she underwent surgery.  Ward makes no complaints regarding that leave of absence.

visit businesses in the City, and attend merchant association meetings.

In January 2010, After Adams did not see any improvement in Ward's productivity, she started meeting with Ward monthly. Ward was required to provide Adams with a monthly report of her work activities, including a record of every business she visited and merchant association meetings she attended.

Ward's January 2010 report states that "on or about" that month, Ward visited thirteen businesses and attended three merchant association meetings. It also reflects that she attended the Railroad Park bid opening, an Economic Justice Committee meeting, a luncheon of the Greater Birmingham Ministries for Professional and Economic Leaders, and that she watched a webinar from her office.

Ward's monthly reports for February through August 2010 contain much less. These reports indicate that Ward only met with four business during seven months. The February 2010 report lists identical entries for merchant association meetings and businesses visited as the January 2010 report. The only new information on the report is information about the Small Business Administration that Ward copied from the internet. Ward confirmed at her deposition that the February 2010 report does not include any new meetings, events, or businesses visited.

The April 2010 monthly report reflects that Ward only met with

4

one business, the Midfield School of Cosmetology, which is not a business within the City.  The report also reflects that Ward met with an individual named Barry Stein about another business not within the City.  The only other work listed on the report was that Ward had a second meeting with three businessmen that she had met with in January 2010.  The May 2010 report indicates that Ward did not visit any businesses that month.  Ward's reports for July and August 2010 reflect that she met with two businesses.

After noticing that Ward's monthly reports did not change substantively from month to month, Adams called some of the merchant associations listed on the reports and learned that Ward had not actually attended the meetings she listed on the reports. Adams also noticed that some of the entries on the reports were items worked on by other employees.

Concerned about Ward's lack of productivity and doubts about her whereabouts, Adams, on March 5, 2010, implemented an office protocol for all employees when going to be out of the office.  The "Outlook Protocol" required all employees to list when they were going to be out of the office, the meeting location and purpose, and the business contact and phone number on their computer's Outlook calendar.  Adams also required that she have "viewing rights" that allowed her to see all the employees' Outlook calendars from her computer.

One day in April 2010, Patton asked Adams where Ward was that

day because she was not in the office.  Adams checked Ward's Outlook calendar, which indicated that she was at a BCIA meeting. Patton had just been at the BCIA meeting and Ward was not there. While Patton was at the BCIA, Michael Bell told him that he had not seen Ward since October 2009.  Ward admits that she did not go to the BCIA in December 2009 or January 2010, but claims that Adams instructed her not to go.  Adams contends that she was under the impression that Ward was supposed to be going to the BCIA and that she was, in fact, going during this time.  Ward continued to put BCIA meetings on her Outlook calender and to provide updates on the BCIA during staff meetings during this time.

On April 28, 2010, Adams notified Ward that she was being charged with failing to fulfill her BCIA assignment and failing to follow the Outlook Protocol.  A Jefferson County Personnel Board ("JCPB") determination hearing was held on April 29, 2010, and Ward received a three-day suspension.  Ward does not here complain about this suspension.

**Anonymous and Fraudulent Letters**

In April 2010, the Birmingham News notified Adams that it had received a letter, purportedly on Office of Economic Development letterhead, which alleged that Adams was being harassed by Mayor Bell to give the BCIA more money because the Executive Director of the BCIA, Michael Bell, was the mayor's brother.  The letter was dated April 28, 2010, the same day that Ward was notified about

6

charges against her relating to her assignment with the BCIA. Adams told the Birmingham News that she did not write the letter and made Mayor Bell aware of the letter.  Around the same time, Adams also received a letter purportedly from Mayor Bell authorizing payment to a contractor.  The letter alarmed Adams because it directed the contractor to forward his banking information to her.  The letter was not written by Mayor Bell.

Adams gave both letters to the Birmingham Police Department's Internal Affairs division for investigation.  Internal Affairs interviewed the employees who worked in the Office of Economic Affairs, including Adams and Ward.  There was no determination as to who wrote either of the letters.  Ward testified at her deposition that she believed that Patton thought she wrote the letter about Adams and maybe the other letter, and that after arriving at this conclusion, Patton decided to fire her.  If, as Ward testified, the decision to fire her was motivated by a belief that she wrote a letter or letters, such a motivation does not remotely implicate the FMLA, which is the sole statute invoked by Ward.

**Subject FMLA Leave**

In May 2010 while serving her suspension, Ward began to feel ill and went to see Dr. William Hall ("Dr. Hall").  Dr. Hall diagnosed Ward with high blood pressure and restricted her to working half-days until her next visit with him.  The court takes

judicial notice of the fact that anger can increase blood pressure. Dr. Hall later continued the half-day work restriction until July 2010.  Adams, as well as the Safety and Health Division of the City's Personnel Department, approved a half-day schedule for Ward from May 12, 2010  until July 15, 2010, when Dr. Hall released the restriction.  Ward never requested any other FMLA leave from the City.

**Ward's Return to Work After Suspension**

When Ward returned to work after her suspension in May 2010, she met with Adams and Patton.  Ward secretly recorded the meeting, during which Adams reviewed a "Tasks Assigned" list that clarified and/or modified Ward's performance improvement plan that had been in place since mid-2009.  For example, one task was for Ward to visit five businesses per week.  When Ward explained that it would be difficult for her to visit five businesses a week because she was only to work half-days, Adams changed the requirement to two business visits per week.  Adams conceded that Ward could not achieve a full day of work while on her half-day leave.

**Ward's Grievances**

Pursuant to the applicable procedure, Ward filed a formal grievance against Adams with the JCPB on May 24, 2010.  Ward complained that since February 2008, Adams had manifested a pattern of negative behavior toward her.  That same day Ward sent Adams an email alleging discriminatory treatment dating back to February

2008.   Ward alleged that Adams had acquired preconceived ideas about her from the former Chief of Operations.   Notably, Ward testified at her deposition that prior to her FMLA leave, she felt that Adams had singled her out, treated her differently from other employees, and was hostile towards her.

On June 28, 2010, Ward amended her grievance to include the allegation that, while taking intermittent FMLA leave, she was "harassed" when she was questioned about work absences by the Internal Affairs detectives during the anonymous letters investigation.   Ward stated that she believed that the questioning was in retaliation to her filing the May 2010 grievance against Adams.   Specifically, Ward concluded her amended grievance by explaining:

> I feel that these actions are a direct result of my Grievance filed on May 24, 2010 and slanderous in nature.
>
> I conceive that this retaliatory efforts by you, Mrs. Tracy Morant Adams because of the Grievance Proceedings that began May 24, 2010.

The only mention of Ward's FMLA leave in these grievances appears in the May 24, 2010 grievance and letter to Adams in which Ward complains about having to meet with the Personnel Department of Health and Safety to provide documentation of the medical basis for her leave.   Only after searching the record on its own did this court find evidence of Ward's targeted references to FMLA retaliation.   On July 10, 2010, Ward submitted a document containing her requests to the hearing officer as "step 3" of the

grievance process.    In  this  document,  Ward  made  explicit
allegations that since she had been working a reduced schedule, she
had  been  "subjected  to  continuous  harassment  and  retaliation."
There is no earlier indication in the record of any contention by
Ward of FMLA retaliation.

The  City's  Personnel  Department  was  notified  of  Ward's
grievance, and on July 10, 2010, Ward presented her grievance with
the JCPB.  She testified that over a two year period Adams had made
her environment increasingly hostile and that the hostility had
escalated on March 5, 2010 with the implementation of the Outlook
Protocol.

**Additional Meetings**

Adams and Polk met with Ward again on June 7, 2010.  Ward
again secretly recorded the meeting.  Adams reminded Ward that she
was required to visit two businesses per week and to complete all
paperwork associated with the visits.  Ward was provided with a
list of businesses that she could visit and a packet with a sample
introductory letter, followup letter, and a survey to complete
after she visited each business.

Adams and Polk met with Ward again on June 21, 2010.  At this
meeting Adams asked Ward to provide a one page summary of grant
ideas.  In response, Ward sent an email with information copied and
pasted from the internet.  When Adams asked Ward to redo the
summary and to include her own thoughts, Ward converted the email

10

summary into a memorandum and gave it to Adams without adding any material.

Adams contends that she saw no improvement in Ward's work performance between the May 12, 2010 meeting and the June 21, 2010 meeting.  There is no evidence that Ward visited Birmingham businesses as she was instructed to do, and in her deposition Ward admitted that she had not done so.

A fourth meeting was held on August 5, 2010.  Ward brought Ronnie Bates, a representative from the Birmingham Association of City Employees with her to the meeting.  She recorded the meeting again.  Ward was still not meeting with two businesses a week.  Although she was not meeting with businesses, Ward continued to be out of the office every afternoon, even after her FMLA reduced schedule ended in July 2010.

**Hostile Work Environment Complaint About Ward**

In September 2010, another employee, Cooper, complained that Ward was creating a hostile work environment in the office.  Specifically, Cooper alleged that Ward was not contributing to the team and was having a negative impact on others in the office.  On September 29, 2010, Adams sent Patton a letter requesting his assistance with the problem.  In the letter  Adams recounted the trouble that she had experienced with Ward's productivity, lack of regard for authority, and insubordination.  That day Ward received

a letter[3] informing her that she would be placed on administrative leave with pay until an investigation into the complaint was completed.  Pursuant to the City's established practice, Ward was escorted out of the office by Patton and three Birmingham police officers.  She was also required to relinquish her work keys and badge.

On October 1, 2010, Polk investigated the allegation against Ward by interviewing Ward's co-workers.  Polk interviewed all of Ward's co-workers except one who was out of town.  The following are responses that Ward's co-workers provided during those interviews

- [I]t is extremely stressful because I work hard and everybody else works hard except one person.  It has been going on for a long time.  It's kind of flaunted that this person acts like "I can do whatever I want to."  If you are giving 100%, it's depressing to watch someone who isn't and nothing is being done.

- I have a past history with [Ward] so I only interact with her when it is work related.  I have a good working relationship with everybody but [Ward].

- [Ward] stares at [Adams] like she can just spit on her.  She also treats [Cooper] like that.  I am not comfortable around her because she behaves like a bully.  There are two things that annoys [sic] her and they are somebody in authority and somebody holding her accountable.

- [Ward] has no respect for [Adams].  When the election of a new administration came, she would walk around [Adams'] door

_____

[3] The letter informing Ward of the complaint against her was incorrectly dated September 10, 2010.  It is undisputed that only *after* Cooper complained about Ward that Ward was given the letter and placed on administrative leave while the complaint was being investigated.

saying "tic-tock, tic-tock" as if to indicate that [Adams] time was running out.  We all would love to get paid for doing nothing, but we have a better work ethic.

- I have an excellent relationship with my colleagues and I think they feel the same about me with the exception of [Ward].

- I feel that [Ward] makes the atmosphere difficult.

- I have a good working relationship with most of the people, but I have no working relationship with [Ward].  I have known . . . and this goes back ten years . . . if you give her an assignment, it goes in a dead hole.  I don't know why nothing has ever been done about her behavior.  You can sit in a staff meeting and when everybody else describes what they have been doing  .  .  .  she doesn't do anything or have anything worthwhile to contribute.

- The rest of us work like a team.  In Business Retention 9 out of 10 people are looking for money . . . so you have to have a network.  If they are looking for industrial sites, I refer them to Griffin.  If they are looking for money, I refer them to [Cooper]. [Ward] doesn't want to do it and she has no intention of doing it.

During the interviews, Polk did not mention Ward's FMLA leave that had ended two and a half months earlier.  Polk did not interview Ward or Adams.  At the end of the investigation, Polk concluded that Ward had created a hostile, uncomfortable, and difficult work environment.

**Ward's Termination**

Adams recommended to Patton that he terminate Ward based on Ward's failure to improve her productivity, complete disregard for authority, low level of performance, lack of contribution, not completing tasks assigned to her, and Polk's conclusion that her behavior created a hostile work environment in the office.

Ward was charged as follows:

> You have met several times with your direct supervisor regarding your assignments; however, you have failed to show any production on the assignments given. Allegations that your behavior has created a hostile work environment have been sustained after an investigation conducted by the City of Birmingham's Personnel Officer.

Attempts to deliver notice of the charge to Ward by certified mail were unsuccessful. Therefore, on October 8, 2010, police delivered the notice to Ward's home. In plain clothes and an unmarked police car, City of Birmingham Police Officer Herman Harris ("Officer Harris") delivered the notice. Because Ward lives outside of the City, Office Harris asked a police officer from Ward's city to meet him at Ward's house. Ward alleges that a Jefferson County Sheriff's Deputy was also present when the notice was delivered. The officers also delivered a notice of an amended determination hearing on October 13, 2010.

The hearing was held on October 18, 2010, where Ward was represented by an attorney. The decision was that Ward would be terminated, effective October 21, 2010. Ward appealed the decision to the JCPB. After four days of testimony before the JCPB, including that of Ward, the Hearing Officer, on December 20, 2011, recommended that the termination be upheld. After subsequent litigation[4] before the JCPB and the Circuit Court of Jefferson

---

[4] The somewhat complicated procedural history of this case is as follows. On January 20, 2012, the JCPB ordered that Ward be reinstated, but that she was not entitled to back pay. On April 17, 2012 the Circuit Court of Jefferson County, Alabama reversed

County, the Hearing Officer, Personnel Board, and Circuit Court all upheld Ward's termination.   Ward's application to the Alabama Department of Industrial Relations for unemployment benefits was denied.

### DISCUSSION

**A.   Motions to Strike**

In Ward's her motions to strike portions of the Adams and Polk declarations she argues that they are (1) based on speculation, conjecture, and legal conclusions, rather than the declarant's personal knowledge, and (2) constitute a "sham," as prohibited by the sham affidavit doctrine adopted by the Eleventh Circuit in *Van T. Junkins & Assoc., Inc. v. U.S. Indus.*, 736 F.2d 656, 657 (11th Cir. 1984).

The requirements for affidavits and declarations offered in support of or in opposition to a motion for summary judgment are outlined in Rule 56(c)(4), Fed. R. Civ. P.  That rule requires that a declaration must be based "on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on matters stated." Fed. R. Civ. P. 56(c)(4).   Additionally, statements in a declaration may be

the JCPB decision.  On June 12, 2012, the JCPB determined that the Hearing Officer's December 20, 2011 recommendation was due to be affirmed and upheld Ward's termination.  Finally, on September 17, 2012, the Circuit Court of Jefferson County found that there was no substantial evidence to support to JCPB's prior decision to reinstate Ward and upheld the Hearing Officer's recommendation to sustain Ward's termination.

stricken as a matter of law when it is obvious that they constitute a "sham." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986). This occurs when there is a "flat contradiction" between the declaration and the declarant's prior, sworn testimony. *Id.* On the other hand, "[i]ssues of credibility of witnesses and weight of evidence are questions of fact which require resolution by the trier of fact." *Id.* at 954; *see also Choudhry v. Jenkins*, 559 F.2d 1085, 1090 (7th Cir. 1977) ("[E]very discrepancy in an affidavit does not justify a district court's refusal to give credence to such evidence."). A declaration, or portions of it, will be disregarded only "when a party has given clear answers to unambiguous questions . . . [and that person attempts] thereafter [to] create such an issue with an affidavit that merely contracts, without explanation, previously given clear testimony." *Tippens*, 805 F.2d at 954 (quoting *Van T. Junkins & Assocs. v. U.S. Indus.*, 736 F.2d 656, 657 (11th Cir. 1984)).

### 1.   Adams Declaration

Ward contends that portions of the Adams declaration are (1) a "sham" because they contradict Adams' prior, sworn testimony; (2) irrelevant; and (3) conclusory statements that go to the ultimate issue. All three of Ward's arguments lack merit.

Ward asserts that ¶7, ¶¶15-16, and ¶42 of the Adams declaration are due to be stricken because they contradict her JCPB hearing testimony and her September 29, 2010 letter to Patton, in

which Ward contends that Adams stated that she only had problems with Ward's performance over the "course of several months." The relevant portions of the Adams declaration relate to issues Adams experienced with Ward's work performance outside of this time frame. Notably, Adams' letter to Patton is not "prior, sworn testimony" and therefore is not subject to the sham affidavit doctrine. Adams' hearing testimony does not contradict her declaration. Nowhere in her testimony does Adams state that she *only* had problems with Ward's job performances over the "course of several months." Instead, Adams' testimony is replete with instances in which she testifies regarding continuing issues that she had with Ward's job performance. There is no "obvious sham" or "flat contradiction" to warrant application of the sham affidavit doctrine.

Ward next contends that ¶44 of the Adams declaration should be stricken because it contradicts Adams' JCPB hearing testimony.[5] Paragraph 44 of the declaration states that "Lisa Cooper complained that plaintiff was creating a hostile work environment in the office." Ward asserts that this flatly contradicts Adams' hearing testimony that Cooper stated that "she was concerned about the environment in the Office of Economic Development being conducive to the work relationship." The argument that these statements are

_____

[5] Ward also argues that ¶44 contradicts the September 29, 2010 letter that is not prior, sworn testimony subject to the sham affidavit doctrine.

contradictory is facially specious.  The statement that someone
created a hostile work environment is entirely consistent with
expressing concern about relationships at work.  While these two
statements are not identical, they are certainly not contradictory.
Furthermore, Ward's argument that Adams' use of the words "hostile
work environment" is an attempt to provide legal meaning to her
statement is incorrect.  There has been no Title VII violation
alleged in this action.  The term "hostile work environment" as
used in this action is a layman's term.

Ward's contention that ¶17 contradicts Adams' JCPB hearing
testimony is equally baseless.  In ¶17 Adams states that "[i]n
January 2010, I began meeting monthly with Mrs. Ward . . . ."  Ward
argues that this is inconsistent with Adams' testimony that she
only had four meetings with Ward in 2010.  Ward's argument
inaccurately describes Adams' testimony.  Attempting to demonstrate
a contradiction, Ward cites testimony in which Adams confirms that
there were four specific meetings with Ward in 2010.  Nowhere did
Adams testify that she only had four meetings with Ward.  The four
meetings Ward cites occurred on May 12, June 7, July 21, and August
5.  It is clear from Adams' testimony that these meetings were in
addition to the meetings or work sessions she had with Ward from
January to April 2010.  Ward herself testified at her deposition
that, starting in January 2010, she met with Adams at least
monthly.  Ward cannot create a contradiction where one does not

18

exist.

Ward's next argues that several paragraphs of the Adams declaration are irrelevant and are therefore due to be stricken. Ward contends that ¶11 and ¶¶ 26-31 are irrelevant because they relate to anonymous and fraudulent letters sent to Adams and The Birmingham News.  This argument is strange because Ward herself offered these letters as the reason for the City's adverse employment action.  Specifically, in the complaint Ward alleges that the City harassed her by interrogating her about these letters.  She also testified that she believes that she was fired because Patton thought she wrote at least one of the letters. Based on Ward's own contentions, the letters are relevant.

Ward's arguments based on the relevance of other paragraphs of the Adams declaration are equally unconvincing.  Ward argues that ¶¶12-14 and ¶¶20-25 should be stricken as irrelevant because they relate to her work with the BCIA, and her discipline associated therewith, as well as with issues regarding her noncompliance with the Outlook Protocol's calendaring aspect.  It is difficult for the court to understand how Ward can contend that these items are not relevant.  Ward's alleged failure to perform her work and any subsequent discipline prior to her termination would be probative in a trial of this case.  According to the City, from 2008 until Ward's termination, Adams repeatedly found that Ward did not perform her duties.  The issues relating to the BCIA assignment and

19

failing to follow the calendar protocol are examples of such shortcomings.

Ward moves to strike ¶50 of the Adams declaration as a conclusory statement that goes to the ultimate issue of the case. This paragraph of the declaration states that "I never did anything to interfere with Felecia's [sic] Ward requests for FMLA leave but in fact tried to assist her in that leave. I also never retaliated against Ms. Ward for taking any leave. I never harassed Ms. Ward or created any hostile environment for her. Every action I took in regards to Ms. Ward was taken for legitimate reasons." Ward's complaint alleges that Adams interfered with her FMLA rights and retaliated against her. Adams is certainly entitled to respond to these allegations. Adams' words are not taken as legal conclusions, but as Adams' account of her actions and motivations.

For the foregoing reasons, Ward's motion to strike portions of the Adams declaration will be denied.

### 2.    Polk Declaration

Ward advances similar arguments in support of her motion to strike portions of the Polk declaration. Specifically, Ward contends that certain paragraphs are (1) a "sham" because they contradict prior, sworn testimony; (2) "self-serving" and irrelevant; and (3) conclusory statements that go to the ultimate issue.

Ward argues that ¶¶4-5 of the Polk declaration should be

stricken because they contradict Polk's JCPB hearing testimony.
The relevant portion of the declaration states that Polk believed
that "Ward's behavior did in fact create a hostile work
environment."  At the JCPB hearing, Polk testified that Ward
created an "uncomfortable work environment."  Again, Ward is
parsing words in an attempt to create a contradiction where one
does not exist.  The contention that these statements are
contradictory dishonors the English language.

Next, Ward contends that ¶6 should be stricken because it
contradicts "Defendant's own admission" regarding the City's
policies and procedures.  This is not the type of contradiction
that the sham affidavit doctrine is intended to prevent.  The law
does not provide that a declaration be stricken when the
declarant's testimony allegedly contradicts another witness's
testimony. *See e.g.*, *Duvall Chems. v. Osterman & Co.*, No. 4:04-cv-
0059, 2006 WL 6848733, at *2 (N.D. Ga. Mar. 14, 2006).  Because
Ward has not claimed that Polk testified in contradiction to her
own declaration, the sham affidavit doctrine is wholly
inapplicable.

Ward seeks to have the court strike ¶8 of the Polk declaration
as self-serving and irrelevant.  First, the fact that the statement
is helpful to the City is not a ground to strike.  *See e.g.*,
*Stallworth v. Okaloosa County Sch. Dist.*, No. 3:09-cv-404, 2011 WL
4552187, at *5 (N.D. Fla. Sept. 30, 2011) ("There is nothing

21

inherently wrong with considering self-serving testimony at the summary judgment stage.") (citing *Price v. Time, Inc.*, 416 F.3d 1327, 1345 (11th Cir. 2005), *modified on denial of reh'g on other grounds*, 425 F.3d 1292). Furthermore, Polk's statements regarding her FMLA training are relevant to the claims at issue. Ward's FMLA claims include specific allegations against Polk and how certain of Polk's actions violated FMLA. As such, the fact that Polk had training on FMLA compliance is relevant.

Ward moves to strike ¶9 of the Polk declaration on the ground that it is a conclusory statement that goes to the ultimate issue. This arguments fails for the same reasons that it failed when asserted in relation to the Adams declaration.

For the foregoing reasons, Ward's motion to strike portions of the Polk declaration will be denied.

**B.   Motion for Summary Judgment**

The FMLA recognizes two types of claims: interference claims and retaliation claims. A plaintiff makes a claim for interference when she asserts that her employer denied or otherwise interfered with her substantive rights under FMLA. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006). A claim for retaliation under FMLA is appropriate when an employer discriminated against an employee because she engaged in an activity protected under FMLA. *See id.* The City seeks summary judgment both as to Ward's claim for FMLA interference and her

claim for retaliation.

### 1.   FMLA Interference

The Eleventh Circuit is clear that to establish an FMLA interference claim, a plaintiff must demonstrate that (1) she was entitled to a benefit under FMLA and (2) the benefit was denied. *Hurlbert*, 439 F.3d at 1293; *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206-07 (11th Cir. 2001) (citing *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1353-54 (11th Cir. 2000)).  One such benefit is that an employee may take leave due to, among other things, a serious medical condition.  *See* 29 U.S.C. § 2612(a)(1)(D).  While there may be some dispute as to whether Ward suffered from a "serious medical condition," there is no dispute that the City provided her with every arguably available benefit when it allowed her to work a reduced schedule from May to July 2010.  Ward testified at her deposition that she received all the leave she requested.

Instead, in support of her interference claim, Ward argues that she is entitled to FMLA relief because she was harassed after her intermittent leave and was ultimately terminated.  Ward makes no other allegations as to benefits which she was denied. Allegations of harassment and termination are appropriately addressed under a claim for retaliation, not interference. *Hulbert*, 439 F.3d at1293; *cf. Simpson v. Office of Chief Judge of Circuit Court of Will County, Ill.*, 520 F. Supp. 2d 998, 1009 n.10

23

(N.D. Ill. 2007) ("[H]arassment alone does not establish an interference claim . . . because to establish an interference claim [plaintiff] must show the defendants denied her a right under FMLA.").

Ward has offered no evidence that she was denied a benefit to which she was entitled. As such, she has not suffered an cognizable injury to sustain an FMLA interference claim. *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1275 (11th Cir. 1999) (per curiam) ("[A] plaintiff suffers no FMLA [interference] injury when she receives all the leave she requests."). Accordingly, Ward's claim for FMLA interference fails as a matter of law.

### 2.    **FMLA Retaliation**

In FMLA retaliation cases, the Eleventh Circuit applies the same burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1974), that it uses to evaluate claims under Title VII of the Civil Rights Act of 1964. *Schaaf v .Smithkline Beecham Corp.*, 602 F.3d 1236, 1243 (11th Cir. 2010). Under this framework, Ward must first establish a *prima facie* case by demonstrating that (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) a causal connection between the statutorily protected activity and the adverse employment action. *Id.; see also Krutzig*, 602 F.3d at 1234. If Ward establishes such a *prima facie* case, the burden then shifts to the City to articulate a legitimate reason

for the adverse action. *Schaaf*, 602 F.3d at 1243 (citing *McDonnell Douglas Corp.*, 411 U.S. 792, 93 S. Ct. 1817). If the City provides such a reason, Ward must then show that the City's proffered reason for the adverse action is pretextual. *Id.* (citing *McDonnell Douglas Corp.*, 411 U.S. 792, 93 S. Ct. 1817).

Ward cannot establish a *prima facie* case[6] of retaliation because there is no evidence that the City's decision to terminate her was causally related to her FMLA leave. To establish the causal connection element, a plaintiff must prove that the protected activity, here Ward's FMLA leave, and the adverse action, here Ward's termination, were "not wholly unrelated." *Krutzig*, 602 F.3d at 1234 (quoting *Brungart v. Bellsouth Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)). Causation may be inferred by close temporal proximity between the protected conduct and the adverse employment action. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). Close temporal proximity, however, is not the only method by which a plaintiff can prove a causal connection. Even when a significant amount of time has elapsed, as in this case, a causal connection may exist when the protected activity and the adverse employment action are linked by

---

[6] The parties dispute whether Ward was entitled to FMLA. Ward has presented sufficient evidence that she suffered from high blood pressure and was under a doctor's continued care for her condition to qualify as a "chronic condition" under 29 C.F.R. § 825.115(c).

a chain of intervening retaliatory acts.  *See Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998).

In this case a causal connection is not established solely on close temporal proximity.  Temporal proximity, without more, must be "very close," and in this case is not close.  *Cooper Lighting, Inc.*, 506 F.3d at 1364 (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 121 S. Ct. 1508, 1511 (2001)).  The Eleventh Circuit has held that as small as a two month gap between a statutorily protected act and the adverse employment action is too long to create a jury question as to the essential causal connection element.  *Williams v. Waste Mgmt., Inc.*, No. 10-13121, 2011 WL 207932, at *3 (11th Cir. Jan. 25, 2011) (affirming summary judgment based on lack of causal connection when there was a two month gap between the protected expression and the adverse employment action); *see also Cooper Lighting, Inc.*, 506 F.3d at 1364 (three month gap); *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) (three and a half month gap); *Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004) (three month gap).

In the present case, approximately two and a half months elapsed between the end of Ward's FMLA leave in mid-July 2010 and Ward's being informed of the charges against her on September 29, 2010, that, along with other issues, led to her termination.  Two and a half months is too long.  *See e.g., Williams*, 2011 WL 207932, at *3.

Ward argues that a causal connection nevertheless exists based on other evidence of retaliatory intent.  Specifically, Ward points out that on June 21, 2010, during the time she was on the approved half-day schedule, Adams told an Internal Affairs investigator that "it wasn't right for Ward to get a paycheck for every day but not to stay all day."  Ward argues that this comment is evidence of Adams' retaliatory intent and creates a reasonable inference that she was discharged in retaliation for taking FMLA leave.

The record reflects that Adams' actual comment to the investigator was that "it's just not right to come to work get a paycheck every day and not work when you're facing [what] we're facing things that we are facing right now, it simply is not fair." On its face, this comment is not about Ward's medical leave. Instead, it is a comment about coming to work and doing one's job. In context, Adams was talking about Ward's suspension for not showing up for her assignments, an event which occurred prior to Ward's FMLA leave.  When Adams did discuss Ward's leaving work around noon, she discussed it in terms of how Ward had been leaving the office unaccounted for since *before* Adams joined the office.

Ward also argues that Adams' September 29, 2010 letter to Patton, which stated that Ward had productivity issues over the course of several months, "links" Ward's productivity issues to the time she was on leave, evidencing Adams' animosity toward Ward for taking medical leave.  This argument misstates the contents of the

letter.  The letter does not state that Adams had problems with
Ward for only several months.  Patton had only been working in the
office for a few months.  The letter states "[a]s you know over the
course of several months" because that is the amount of time that
Patton had been working with Adams and Ward.  It is undisputed that
Adams had issues with Ward's performances since 2008, not just the
several months before Ward's termination.  Neither of Ward's two
arguments for a link between the FMLA leave and her termination is
supported by the evidence.

Even if Ward could prove causation and thus a *prima facie* case
of retaliation, she has not provided any real evidence that the
City's legitimate, nondiscriminatory reasons for discharging her
were a pretext for retaliation.  The City says that it terminated
Ward because she failed to improve her productivity, had a complete
disregard for authority, exhibited a low level of performance and
contribution, failed to complete assigned tasks, and created a
hostile or very difficult work environment in the office.  Ward has
not offered evidence upon which a reasonable jury could find that
any of these proffered legitimate, nondiscriminatory reasons wre
inventions to cover up a retaliatory motive.

Ward admits that one of her job responsibilities was to visit
businesses in the City.  It is undisputed that between February
2010 and August 2010, Ward met with only four businesses (not all
of which were even within the City).  During this time, Ward was

28

supposed to be visiting two businesses per week. Adams had initially suggested that Ward be tasked with visiting five businesses per week, but reduced the requirement to two business to accommodate Ward's reduced schedule from May to July 2010. It is also undisputed that Ward was not attending merchant association meetings, was not working with the BCIA, and was not following the Outlook Protocol. Ward has offered no evidence to dispute the obvious fact that Adams believed that Ward was not performing her job at an acceptable level. Ward also does not dispute that her co-workers complained about her and felt that she created a hostile or unpleasant work environment. Polk's interviews with Ward's co-workers, excerpts of with are reproduced above, are undisputed.

In a move that somewhat perplexes the court, Ward offers a couple of reasons as to why Adams and Patton treated her as they allegedly did - neither of them related to her FMLA leave. Ward testified at her deposition, in a conclusory manner, that Adams had preconceived ideas about her acquired from a previous staff member. This is a matter of conjecture and not a fact. She contends that beginning in 2008, Adams was hostile to her, singled her out, and treated her less favorably than others in the office. Ward also claims that Patton decided to terminate her when he concluded that she wrote the one of the anonymous letters. Ward's contention that she was discharged in retaliation for taking FMLA leave is not only unsupported by the evidence, but is contradicted by Ward's own

deposition testimony.

Ward has not shown that the City's proffered reasons for her termination were a pretext for retaliation based on her FMLA leave. There is nothing for a jury to decide in this case.   The City is entitled to summary judgment on Ward's retaliation claim.

**CONCLUSION**

For the foregoing reasons, the two motions to strike filed by Ward are hereby DENIED, and the motion for summary judgment filed by the City will be granted by separate order.


Done this 8th day of February 2013.


**WILLIAM M. ACKER, JR.**
**UNITED STATES DISTRICT JUDGE**